IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KRISTEN JANDA,

                          Plaintiff,                      OPINION AND ORDER

        v.
                                                         17-cv-339-wmc
SERGEANT DAVIES, SERGEANT JANAK,
and SERGEANT COLLINSWORTH,

                          Defendants.

        This case concerns two, separate events, although both occurred while *pro se* plaintiff Kristen Janda was in the custody of the Lincoln County Jail.  In the first, which took place during December of 2012, jail employees suspected Janda of consuming an illegal substance and placed her in a medical observation cell, apparently for several days; and in the second, during December of 2014, they suspected Janda of possessing and concealing drugs and subjected her to strip and cavity searches.  Janda later filed suit against the officers allegedly involved in those events, and this court granted her leave to proceed against three Lincoln County Sergeants on her constitutional claims under 42 U.S.C. § 1983.  In particular, Janda is proceeding against defendants: Jolena Davies and Ivy Janak on a First Amendment retaliation claim related to Janda's transfer to a medical observation cell in December 2012; Davies, Janak and Chad Collinsworth on Fourth and Fourteenth Amendment claims challenging a December 2014 cavity search and strip search; and Davies on an Eighth Amendment harassment claim for allegedly subjecting Janda to an unnecessary, second strip search.

Now before the court is defendants' motion for summary judgment.  (Dkt. #22.) Since no reasonable factfinder could conclude on this record that defendants' conduct in either December 2012 or December 2014 violated Janda's constitutional rights, the court will now grant defendants' motion.

UNDISPUTED FACTS[1]

**A.  December 2012 placement in medical observation cell**

On December 2, 2012, plaintiff Janda was incarcerated at the Lincoln County Jail. Sergeant Davies arrived for her shift at 4:45 a.m. that day, and she was told that an inmate named "Cassiopia" was acting belligerently and incoherently, exhibiting characteristics of someone who had ingested and was under the influence of illicit drugs.  Sergeant Janak, who had worked the overnight shift, also reported to Davies that Janda had been displaying unusual behavior the previous night, but she appears to have played no other role in the subsequent events involving Janda that day.

Since multiple female inmates appeared to be under the influence of drugs, jail staff decided to investigate the possible smuggling of an illegal substance into the jail.  After interviewing Cassiopia himself, Sergeant Collinsworth reported to Davies that she appeared to be hallucinating, and he further confirmed concerns that other inmates may have ingested illegal drugs based on Cassiopia's comments during the interview.

---

[1]  Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

Sergeant Davies then decided to search the entire cell block where female inmates are housed at the Lincoln County Jail — D-block.  Davies also required all female inmates to undergo a full laundry exchange, so that their current clothing could be searched.  During the clothing exchange, Davies observed that Janda and another inmate named "Erin" were acting oddly and also exhibiting characteristics of someone who has ingested drugs.  At that point, Erin was taken into an interview room, and Janda was moved into a holding cell.  Officer Amber Loomis first interviewed Erin, who admitted to taking drugs given to her by Cassiopia, although Erin told Loomis that she did not know what kind of drugs they were.  Then Officer Loomis spoke to Janda, who also admitted to taking drugs given to her by Cassiopia, but claimed not to know whether the drugs she ingested were in pill form or a powder.  During the interview, Janda further told Loomis that she "was losing her mind," accused staff of putting recording devices in the speakers in the room, and started crying.[2] Finally, Loomis noted that Janda was hard to understand and not making much sense.

After their interview, Sergeant Loomis decided to move Janda back to the holding cell for further observation for several reasons, including:  (1) other inmates confirmed they brought methamphetamine into the jail; (2) Janda confirmed she had taken drugs obtained from these other inmates; (3) Janda made concerning comments about losing her mind; and (4) Janda was behaving and speaking oddly, making her hard to understand.  While Janda argues that she should only have been kept in the observation cell while other inmates were interviewed and undergoing urinalyses, she does not dispute Loomis's reasons

---

[2] Although Janda asserts that this statement was taken out of context, she does not dispute saying it to Loomis.

for keeping her in a holding cell longer.

Loomis next questioned Cassiopia again about the drugs, who finally identified the drug they used as methamphetamine.  Inmate Erin then told Loomis that the drugs she took contained both methamphetamine and heroin, while again confirming that she received the drugs from Cassiopia and gave them to Janda.  Around this same time, Erin told Sergeant Davies that Janda had taken methamphetamine the night before as well, and that she had begun to feel ill.  From her own experience, Erin said she knew that Janda was having a "bad trip."

After initially refusing to give a urine sample, Janda eventually agreed to do so at approximately 3:30 p.m., testing positive for methamphetamine and negative for opiates.  At about 4:00 p.m. that day, with Janda still in a holding cell per Sergeant Loomis, Davies asked her what actually happened on the cell block.  Janda was emotional and angry, but would only say that she did not respect the jail for letting the drugs come in, she did not want to talk more, and she wanted to go to sleep.  At that time, Sergeant Davies attests that she did not want to move Janda back to her regular cell block right away out of concerns for her behavior, health and mental state.  Moreover, according to Davies, Janda did not mention to Davies that she wanted to contact a lawyer, but rather said they could lock her down, because she "did not give a shit."  (Davies Decl. (dkt. #25) ¶ 20.)  At about 5:43 p.m., Deputy Sam Steckbauer interviewed several inmates involved in the drug investigation, including Janda, who also told Steckbauer that she took something, but again claimed not to know what.  At that time, Steckbauer noted that Janda was very withdrawn and could not keep her head up; he further noted that Janda did not ask to leave or for an

attorney.[3]

Ultimately, Janda claims that she remained in the medical observation cell from December 2 until December 5, 2012.  During that time, she did not have access to her personal property, including a change of clothing, hygiene items, sheets, a drinking cup or towels.  While Janda also claims that she missed a December 3, 2012, court appearance, when an inmate has an upcoming court appearance and jail staff have concerns that an inmate is under the influence of drugs, staff may call the court prior to the appearance to advise of the situation and request the hearing be rescheduled because of the inmate's state.  According to defendants, this most commonly occurs at an initial appearance, so the inmate can arrive for her first appearance sober.  Defendants further maintain that this type of rescheduling does not have an adverse impact on the inmate's case, and the court can usually accommodate and reschedule the hearing quickly.  Whether that actually occurred in this case is unclear, but then so is any evidence of an adverse consequence from Janda having missed a hearing.

---

[3] Janda purports to dispute this, citing her sworn statement (Janda Decl., Ex. 2 (dkt. #39-2) 3-4), and a declaration from a person named Jennifer Boyd (Janda Decl., Ex. 1 (dkt. #39-1).).  In particular, Janda claims that she started asking for an attorney after an interaction with Janak, apparently on the evening of December 1.  (*See* Janda Decl., Ex. 2 (dkt. #39-2) 3.)  However, Janda does not attest that she asked any of the defendants to speak to an attorney after being placed in the holding cell, nor does she attest that defendants knew she was asking for an attorney.  Moreover, defendants point out that Janda failed to respond to their specific requests for an admission that she had *not* asked for an attorney or threatened to report Davies and Ivy to an attorney (*see* dkt. ##30, 30-1, at 2), and an "admissions made under [Federal Rule of Civil Procedure] 36, *even default admissions*, can serve as the factual predicate for summary judgment."  *United States v. Kasuboski*, 834 F.2d 1345, 1349-50 (7th Cir. 1987) (emphasis added).  Further, "[a] judicial admission trumps evidence."  *Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996) (citing *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir. 1993)).  Since Janda neither disputed her failure to respond to defendants' requests for admission, nor requested to withdraw those admissions under Fed. R. Civ. P. 36(b), the court accepts as undisputed for purposes of summary judgment that she did not ask to see an attorney after placement in the holding cell on December 2, 2012.

**B.      December 2014 strip search and cavity search**

On December 15, 2014, Janda was again incarcerated at Lincoln County Jail.  That day, jail staff found Janda seated on the floor of the shower area, wrapped in her blanket, and displaying odd behavior.  Sergeant Jolena Davies then walked into the shower area to ask what she was doing.  Although Janda responded that she was showering, Davies could see that the water was not running and the area around her was not wet.  When Davies next asked why Janda was sitting on the floor, she claimed to have just "inserted a depository."  (Davies Decl. (dkt. #25) ¶ 30.)  When Davies asked if Janda still planned to take a shower, Janda responded in the affirmative, but for the next five minutes, she continued to sit on the floor without attempting to take a shower.  At some point, jail staff finally entered the shower area, directed Janda to get dressed, and escorted her to a holding cell.

In the holding cell, Janda continued to display odd behavior, including reading a book on her cell floor with her mattress over her head.  Given Sergeant Davies' prior interactions with Janda at the Lincoln County Jail, she concluded that Janda's behavior was not normal.  Indeed, based on Janda's comment about a "depository" and behavior in the shower, Davies suspected that Janda may be under the influence of drugs.  Further, when Davies spoke with Janda at about 6:30 p.m. that evening, she observed that Janda was still speaking oddly, and her speech and thought process appeared delayed.  Due to her continued abnormal behavior, Davies then asked Janda to submit to a voluntary urine

test, but she refused at that point.[4]

Due to her abnormal behavior and refusal to submit to a urine test, Lincoln County Jail staff next searched her cell for contraband.  As shift sergeant, Davies also authorized a strip search of Janda for contraband, which she believed was consistent with a jail policy that permitted a strip search to ensure inmate and staff safety and to prevent introduction of contraband into the jail.  Sergeants Davies and Ivy Janak performed the strip search of Janda at approximately 7:00 p.m. that same evening.[5]

Neither Janda's strip search nor her cell search uncovered any additional drugs, nor containers in which Janda may have stored or transported drugs, although shortly after the strip search, Janda agreed to provide a urine sample, which was positive for THC, cocaine and methamphetamine.  Janda claims that the results of these tests were falsely recorded, but she again cites no evidence permitting such an inference.  Instead, Janda submits medical records from a visit to a hospital on December 22, 2014.  (*See* dkt. #39-3 at 52-53.)  While those records *do* indicate that Janda tested negative for drugs, the reference in

---

[4]  Janda disputes that she initially refused the urine test, but the only evidence offered to contradict Davies' averment to this effect is proof that she eventually took the test.

[5]  Defendants' position is that this was the only strip search performed on Janda on December 15, 2014, and while Janda claims that she was "subject to 2 forms of strip search" (dkt. #40 at 11), Janda has submitted no evidence that Sergeant Davies and Janak performed (or ordered) a second strip search.  Instead, Janda claims that the "first strip search was just the observation of me while I changed out uniforms.  The second was more invasive which included the squat and cough technique." (Janda Decl., Ex. 2 (dkt. #39-2) at 5.)  While unclear, her description of the first "strip search" appears to be Janda's interpretation of what occurred when officers directed her to get dressed before leaving the shower room.  At most, it appears during this encounter that Janda was briefly nude while changing, and that the officers then directed her to return to her cell observed her.  Regardless, as defendants point out, Janda admitted that defendants Davies and Janak performed just one search by failing to respond to their request for admission that there was one strip search that day.  (*See* dkt. ##30, 30-1, 30-2.)

the medical records shows that the drug screen may have been performed on December 17 or December 20, 2014, and certainly *not* on December 15, 2014. (*See id.* at 33, 45.) As importantly, these records do not suggest the December 15 results of were wrong, much less falsified.

Regardless, the record shows that Sergeant Davies spoke to Janda about the results of the December 15th urine tests, and after being informed that she had tested positive for multiple substances, Janda admitted that she brought drugs back from the Marathon County Jail, where she had been held the previous week. Janda further admitted using "meth" in the shower that day. When Davies then asked Janda if she had more methamphetamine, she said no. However, when Davies asked whether she also received marijuana at the Marathon County Jail, Janda refused to respond and stated she wanted an attorney. At that point, Davies informed Janda that they had to rule out whether she was concealing anything in a body cavity, which might pose a security or safety risk at the jail, especially because they did not find any type of container in her cell. More specifically, Sergeant Davies attests that she was concerned at this point about Janda's safety, not only because she could overdose or harm herself if she were still concealing drugs, whether by taking them or having them accidentally release if she were holding an improperly-sealed container of drugs inside her body. Obviously, Davies was also concerned for the safety of other inmates to whom Janda could still pass off the drugs. Finally, Davies attests that her concerns were further heightened because of Janda's recent stay at the Marathon County Jail and her admission that she brought drugs back.

The Lincoln County Jail's policies permit a body cavity search if there is an

articulable suspicion that the inmate may be secreting contraband or evidence in a body cavity.  Body cavity searches may only be conducted by a healthcare professional.  Although Janda insists that she told staff she was not concealing drugs, Davies informed Janda she would be sent to the hospital for examination to rule out contraband being concealed in her body.  That evening, Janda was transported to Good Samaritan Hospital and medically evaluated by Dr. Ellen Dar, M.D.  After Janda consented to having her pelvic area x-rayed by emergency room staff, Sergeant Collinsworth was notified and sent to Good Samaritan Hospital to draft a warrant to authorize a cavity search.  Upon arrival, Collinsworth met with Dr. Dar to discuss the x-ray results.  Dar reported that she could see a "shadow" on the x-ray that could be a foreign object in Janda's vaginal or anal cavity, although she could not conclusively state there was, in fact, a foreign object.

While Collinsworth was speaking with Dr. Dar, Janda remained in the exam room with another officer when her erratic behavior escalated.  Specifically, Janda tried to escape from the hospital by sitting up on the bed, jumping off, and starting to run out of the door, despite the officer commanding her to stop.  Although the officer was able to grab Janda's hand, she spun away from him.  The officer then grabbed Janda around her upper chest, physically restrained her, and carried her back to the exam room.  Sergeant Collinsworth and the officer then asked Janda several questions about her state of mind and whether she intended to escape again.  Janda responded that while she did not want to go back to jail, she would not try to run again.

At that point, Collinsworth applied for a search warrant to allow Dr. Dar to search Janda's vaginal and anal cavities for methamphetamine, cocaine, marijuana, other drugs

and/or packaging materials." (Collinsworth Decl., Ex. C (dkt. #27-3).) In the supporting affidavit, Collinsworth noted: Davies' report about the events earlier in the day; Janda's positive drug test for THC, methamphetamine and cocaine; the continuing concern that Janda may be hiding drugs inside her body; and Dr. Dar's statement that there was a shadow on the x-ray that could possibly be a foreign object. (*Id.*) Collinsworth also attests that he did not conspire with Dr. Dar to misinterpret the x-ray, nor did he fabricate or conspire to fabricate a phantom shadow on her x-ray when applying for a search warrant. On December 16, 2014, at 12:43 a.m., Lincoln County Judge Jay Tlusty signed a warrant for a cavity search of Janda.

That morning, Dr. Dar performed a body cavity search of Janda in a hospital room, which was carried out in the presence of a female nurse and two female officers. Specifically, Dr. Dar inserted her gloved fingers into Janda's vagina and anus; she did not use any instruments. As a result of that exam, Dr. Dar did not find any foreign objects.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–07 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the

plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

Defendants seek judgment in their favor on the merits of Janda's claims, and on qualified immunity grounds.  Since the court is granting their motion on the merits, it need not address qualified immunity.

## I.   First Amendment Retaliation

Plaintiff Janda claims that defendants Davies and Janak retaliated against her in 2012 by placing her in the medical observation cell after she requested an attorney.  To state a claim for retaliation, a plaintiff must: (1) identify a constitutionally protected activity in which she was engaged; (2) identify one or more retaliatory actions taken by defendant that would likely deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) allege sufficient facts that would make it plausible to infer that plaintiff's protected activity was a motivating factor in defendant's decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  Critical here, "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." *Springer v. Durflinger*, 518 F.3d 479, 485 (7th Cir. 2008) (internal quotation marks omitted); *see also Lang v. Ill. Dept. of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that

11

supports the inference of a causal link.").

As an initial matter, the parties dispute whether plaintiff ever asked to speak to an attorney or indicated that she would complain to her attorney. While plaintiff claims that she started asking for a lawyer as early as December 1, 2012, defendant Davies attests that she never mentioned wanting to talk to an attorney during their interview on December 2, and non-defendant Steckbauer says the same about their interaction on December 2, 2012. Moreover, as previously explained, this evidentiary dispute is of no moment considering plaintiff's failure to respond to defendants' request for admission on this question, which amounts to a judicial admission. *See Kasuboski*, 834 F.2d at 1350 ("Affidavits and depositions entered in opposition to summary judgment that attempt to establish issues of fact cannot refute default admissions."). Finally, even assuming that plaintiff did ask to speak to an attorney *and* Davies and Janak were aware of that request, the record neither supports a reasonable inference that Janak took any action against her *because she asked for an attorney*, nor that Davies required her to be placed in a medical observation cell to punish her *for that reason*.

Starting with Sergeant Janak, her *only* involvement in the events that took place in December of 2012 was reporting to Davies that plaintiff had been acting strangely the previous evening. Given the surrounding events, including overwhelming evidence that plaintiff had used methamphetamine on the evening of December 1, 2012, there can be little doubt that this was an accurate statement. Regardless, Janak was not otherwise involved in placing plaintiff in the holding cell for observation (the alleged adverse action), and given the numerous, intervening causal events after Janak reported her initial concern,

there is no basis for a reasonable juror to find her report was causal.  As such, no reasonable juror could find Janak was "personally involved" in the subsequent decision to place Janda in a holding cell, much less to keep her there for observation, which is by itself fatal to plaintiff's claim against her.  *See Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("individual liability under § 1983 requires personal involvement in the alleged constitutional violation.").

As for defendant Davies, no reasonable factfinder could conclude that she kept plaintiff in the holding cell to punish her for asking to speak with a lawyer.  To start, again assuming for the sake of argument that plaintiff asked to speak to an attorney starting December 1, contrary to her defaulted admission to the contrary, plaintiff has not come forward with evidence that Davies was *aware* of her requests to speak with an attorney. Indeed, plaintiff only claims that she began asking to speak to an attorney generally the night before, and nothing in the record indicates that Davies was present or heard plaintiff's requests that night.  In fact, there is no dispute that Davies only arrived for her shift early the next morning.  And plaintiff has not even suggested that she reiterated her desire to talk to an attorney when Davies spoke to her on December 2.  Without knowing about the protected conduct, it would be unreasonable to infer that Davies intended to punish plaintiff for invoking her right to counsel by keeping her in the holding cell.  *Morfin v. City of e. Chi*, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.") (quotation marks and brackets omitted) (quoting *Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999)).

13

Finally, the evidence is overwhelming that Davies declined to allow plaintiff to return to her cell out of concern for her physical and mental state. Indeed, on this record, Davies' only decision related to plaintiff's continued placement in an observation cell occurred around 4:00 p.m. on December 2, 2012. At that time, Davies asked plaintiff what had happened, and Davies observed that she was emotional, angry and "did not give a shit" if they locked her down. Even if a reasonable jury did not credit these statements, which plaintiff did not deny, there is other compelling evidence that Davies and others did not believe it safe for plaintiff to return to her cell at that time, given that she had taken methamphetamine the night before. Moreover, plaintiff has submitted no evidence suggesting that Davies' decision was driven by any concerns *other than* Janda's mental and physical state, and the safety and security of the jail more generally, both of which are entitled to deference. *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) ("[W]e owe deference to prison officials' decisions when responding to grievances and maintaining order in a volatile environment, and to the justifications offered for those decisions.") (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996)). As such, plaintiff's claim of retaliation for invoking her right to counsel rests purely on speculation and cannot survive summary judgment. *See Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) ("Even though Devbrow's verified complaint alleges retaliation, his speculation regarding the officers' motive cannot overcome the contrary evidence that [defendants'] actions were benign.") (citations omitted). Accordingly, defendants Janak and Davies are entitled to judgment in their favor on plaintiff's retaliation claim against them.

14

## II.      Fourth and Fourteenth Amendment Unreasonable Searches

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.[6]  This includes "the right to be free from unreasonable searches of one's unclothed body."  *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003) (internal citation omitted).  While the Fourth Amendment generally requires the issuance of a warrant based on probable cause before a search may proceed, "the Supreme Court has recognized several exceptions to the warrant requirement."  *Id.* (citations omitted).  Among those exceptions are warrantless body cavity searches of an individual in custody *provided* reasonable suspicion of the presence of a weapon or contraband.  *See United States v. Freeman*, 691 F.3d 893, 901-02 (7th Cir. 2012) (finding reasonable suspicion sufficient to conduct strip search of defendant that found cocaine between his buttocks before he was booked into jail based on (1) his arrest for attempted cocaine distribution, (2) a drug dog's alerting to the presence of drugs at the scene of the traffic stop where no drugs were found, (3) his attempted sale of cocaine before the stop, (4) knowledge that he had a tendency to conceal drugs between his buttocks and (5) his uncomfortable fidgeting at the police station); *Campbell v. Miller,* 499 F.3d 711, 717 (7th Cir. 2007) (agreeing with jury that police had reasonable suspicion for cavity search of

---

[6] The protections of the Fourth Amendment were extended to the states under the Fourteenth Amendment.  *See Zoretic v. Darge*, 832 F.3d 639, 643 (7th Cir. 2016) ("The Fourth Amendment's protections against unreasonable searches and seizures is made applicable to state actors under the Fourteenth Amendment." (citing *DKCLM, Ltd. v. Cty. of Milwaukee*, 794 F.3d 713, 714 (7th Cir. 2015))).

marijuana-possessing arrestee).

The constitutionality of a search is evaluated by "balancing … the need for the particular search against the invasion of personal rights that the search entails." *Campbell*, 499 F.3d at 716 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  Even prisoners, who have extremely limited Fourth Amendment rights, at least have the right to bodily integrity. As such, strip searches and cavity searches like the ones that occurred in 2014, may be unreasonable if not supported by reasonable suspicion.  *Brown v. Polk Cty*, 965 F.3d 534 (7th Cir. 2020) (finding that officers needed reasonable suspicion, not probable cause, that a jail detainee concealed contraband inside her body before moving forward with a cavity search); *see also Henry v. Hulett*, 969 F.3d 769, 774 (7th Cir. 2020) ("We hold that the Fourth Amendment protects a right to bodily privacy for convicted prisoners, albeit in a significantly limited way, including during visual inspections.").[7]

Courts determining the constitutionality of a search must balance "the need for the particular search against the invasion of personal rights that the search entails," and in doing so, consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Campbell*, 499 F.3d at 716 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  As the intrusiveness of the search increases, "the closer governmental authorities must come to

---

[7]  The *Henry* decision was made in the context of a claim brought by a convicted prisoner, and the record in this case does not establish whether Janda was serving a sentence as of December 15, 2014.  However, the *Henry* decision applies with equal force to Janda, regardless of her status as a convicted prisoner or pretrial detainee.  *Henry*, 969 F.3d at 779 ("We highlight that our holding today -- that inmates maintain a privacy interest, although diminished, in their bodies -- pertains to pretrial detainees and convicted prisoners alike.").

demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted." *Id.* (quoting *Mary Beth G. v. City of Chi.,* 723 F.2d 1263, 1273 (7th Cir. 1983)).

While difficult to define, "reasonable suspicion" is itself "a commonsense, nontechnical concept that deals with the factual and practical considerations of 'everyday life on which reasonable and prudent [people], not legal technicians, act.'" *United States v. Lawshea,* 461 F.3d 857, 859 (7th Cir. 2006) (quoting *Ornelas v. United States,* 517 U.S. 690, 695 (1996)). While reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification." *Id.* (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)). Put another way, "reasonable suspicion is less than probable cause but more than a hunch." *Id.* (citing *United States v. Lenoir,* 318 F.3d 725, 729 (7th Cir. 2003)).

Starting with Davies' decision to carry out a strip search, there can be no question that plaintiff's behavior on December 15, 2014, was suspicious and gave Davies grounds to believe that Janda might be concealing contraband on her body. Specifically, on that day, Davies found her inexplicably wrapped in a blanket in the shower area, and when asked what she was doing, plaintiff responded that she was showering and had "inserted a depository," further concerning Davies because there was no sign of running water. Then, after responding that she still wished to take a shower, at least another five minutes passed without plaintiff making any move to shower. Plaintiff's strange behavior continued when she was finally moved back to her cell: she started reading a book under a mattress and

17

appeared to Davies to be having speech delays.  Plaintiff does not (indeed, cannot) dispute any of these actions, since she does not remember the events except in the vaguest of terms, leading *any* reasonable trier of fact to only one reasonable conclusion:  Davies had a solid basis upon which to suspect that plaintiff Janda either took or possessed drugs.

The next inquiry is whether the scope and manner of the subsequent strip search was reasonable.  Here, the Seventh Circuit instructs that prison officials "must" be afforded "'wide-ranging deference in the adoption and execution of policies and practices'" necessary to maintain institutional security.  *Henry*, 969 F.3d at 783 (quoting *Bell*, 441 U.S. at 547). Precise details of the strip search have not been developed on this record, but even accepting plaintiff's description of the strip search itself,[8] there is no basis to conclude that it was overly invasive or went beyond the scope necessary to determine whether she was concealing drugs on her person.  While plaintiff attests that the officers used the "squat and cough" technique during the trip search, the record does not indicate how long the strip search took or where it was conducted, and plaintiff has not suggested (nor submitted evidence suggesting) that defendants Davies or Janak, who are both female, prolonged the strip search in any manner or conducted it in a manner intended to harass or humiliate her.  Plaintiff has also not suggested (nor submitted evidence suggesting) that the strip search took place in the presence of any inmates or jail employees that were not directly involved in conducting the strip search.  As such, there is no basis upon which a reasonable

---

[8] As alluded to in the fact section above, plaintiff suggests the possibility of an earlier, illegal "search," apparently referring to staff requiring her to leave the shower and get dressed before escorting her back to the cell block, but she has offered no evidence that the procedure at that time was in any way unreasonable.

factfinder could conclude that the strip search was carried out in an unreasonable fashion. Accordingly, there is no basis for a reasonable factfinder to conclude that Davies or Janak violated Janda's Fourth Amendment rights in conducting the strip search that day.

Finally, as for the cavity search, defendants point to the Seventh Circuit's decision in *Brown*, in which fellow jail inmates reported that the plaintiff was concealing methamphetamine inside her body.  After officers informed a jail nurse what they had been told because she was more familiar with the plaintiff, that nurse in turn spoke with inmates she felt were reliable, who also corroborated the report about plaintiff concealing methamphetamine.  *Brown*, 965 F.3d at 536.  Additionally, the officers had information suggesting that the drugs plaintiff may have been concealing were not properly sealed, and thus posed a safety risk to the plaintiff herself.  Jail staff next raised their concerns with the jail administrator, who authorized a cavity search.  The plaintiff was then transported to a hospital, where a doctor and nurse performed an ultrasound on the plaintiff's abdomen, which did not reveal contraband.  *Id.* at 537.  Finally, the doctor inspected the plaintiff's rectum and vagina, which also did not reveal contraband.

In *Brown,* this court had granted summary judgment in favor of the officers, and the Seventh Circuit affirmed that ruling.  *Id.* 540-41.  Since the plaintiff was a jail detainee, the Seventh Circuit agreed that her possible concealment of contraband implicated jail safety and security.  *Id.* at 539-40 (rejecting plaintiff's argument that the probable cause standard should apply under the Supreme Court's decisions in *Schmerber v. California*, 384 U.S. 757 (1966), and *Winston v. Lee*, 470 U.S. 753 (1985), since "[n]either [decision] implicated jail security, the interest that weighs so heavily in the balance of the search

here").  Ultimately, the Seventh Circuit held not only that the cavity search of the plaintiff was supported by reasonable suspicion, but that the scope, place and manner of the search were equally reasonable, having been conducted (1) pursuant to a written policy with defined procedures, (2) in a medical setting by medical professionals, and (3) within a reasonable time.  *Id.* at 540.

The court has taken pains to recite the underlying facts in *Brown* because they obviously echo in most respects the circumstances surrounding plaintiff's December 16, 2014, cavity search.  To start, Davies had multiple reasons to suspect that plaintiff may have been concealing marijuana or methamphetamines inside her body after the strip search failed to reveal any contraband that evening, including that plaintiff's urine had tested positive for THC, cocaine and methamphetamine,[9] after which plaintiff *admitted* to Davies not only that she had taken methamphetamines in the shower earlier that day, but that she smuggled drugs into the jail following her stay in the Marathon County Jail.  Plaintiff does not dispute her admission, although she claims to have denied possessing any *more* drugs at that time.  Still, Davies had ample grounds to suspect that she may be concealing drugs inside her body, including that the search of her cell did not uncover any other drugs or a container that she could have used to hold the drugs.

In fairness, unlike the officers in *Brown*, Sergeant Davies did not have other jail inmates corroborating her belief that Janda may be concealing drugs inside her body.  However, that distinction does not render Davies' decision to send her to the hospital for

---

[9]  Janda claims that the results of her urine test that day were falsely recorded, but she submits no evidence in support of that assertion.  More importantly, she submits no evidence that *Davies* falsified the result or had reason to doubt the accuracy of the results.

evaluation unreasonable, since Janda *admitted* to having brought drugs to the Lincoln County Jail and taking methamphetamine earlier that day.  Moreover, Davies attests to her own reasonable concern about the safety and security risks associated with the introduction of drugs to the jail, as well as the risk to Janda's safety should she still be storing drugs inside her body.  Accordingly, based on the undisputed record of the information before Davies, no reasonable factfinder could conclude that she lacked reasonable suspicion to believe Janda was concealing drugs inside her body and to direct that she be sent to the hospital for further examination.

Defendant Collinsworth's actions in pursing the warrant stand on similarly firm ground.  To start, Collinsworth only applied for a warrant for the cavity search until *after* other less intrusive methods of searching Janda were exhausted *and* questions remained even among medical staff about whether Janda was concealing contraband inside her body.  Specifically, despite the strip search and a subsequent x-ray, the officers were not able to rule out the possibility that plaintiff was concealing drugs inside of her body, since Dr. Dar could not state with certainty whether the shadow she observed in Janda's x-ray was a foreign object.  While plaintiff questions Dr. Dar's judgment, she adduces no evidence suggesting that Dr. Dar did not exercise medical judgment in her review of the x-ray.  More importantly, she offers no evidence that *Collinsworth*, who is not a medical professional, had any reason to question Dr. Dar's inability to rule out the presence of a foreign object.  On this record, the subsequent cavity search was supported by reasonable suspicion.  Indeed, Collinsworth obtained a warrant before proceeding with the search, and there is no evidence that any of the representations in his supporting affidavit were incorrect, much

less made knowing them to be false or in reckless disregard of their truth.

Finally, on this record, no reasonable factfinder could find that the manner in which the cavity search was carried out was unreasonable.  Like *Brown*, the extreme invasiveness of the search is unquestionable, but so, too, was the search performed pursuant and in accordance with jail policy.  Moreover, the defendants here went further to justify the cavity search than the officers did in *Brown*, having applied for and obtained a warrant.  Furthermore, no evidence of record indicates that Dr. Dar unnecessarily prolonged the cavity search.  Finally, while Janda was afforded less privacy than Brown because Dr. Dar carried out the cavity search in the presence of a female nurse and two female officers, there was ample justification for officers to be in the room:  Janda had attempted to escape from the examination room and subsequently told an officer that she did not want to go back to jail.  Given that context, no reasonable factfinder could conclude that the nurse's and two female officers' presence for the cavity search unnecessarily infringed upon her privacy.  Nor is there any dispute that Dr. Dar herself performed the search, and she did so without using any instruments.  On this record, therefore, defendants Davies, Janak and Collinsworth are unquestionably entitled to judgment as a matter of law on plaintiff's Fourth and Fourteenth Amendment unreasonable search claims.

III.   **Eighth Amendment**

This then leaves only plaintiff's Eighth Amendment claim that defendant Davies conducted or ordered that she undergo a second strip search before she went to the hospital on December 15, 2014.  The court granted Janda leave to proceed on an Eighth

Amendment claim related to this alleged, second strip search because forced nudity violates the Eighth Amendment when "motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security in prisons." *King v. McCarty*, 761 F.3d 889, 897 (7th Cir. 2020), *rev'd on other grounds*, *Henry*, 969 F.3d 769. However, in failing to respond to defendants' request for admissions, plaintiff has legally conceded that Davies did not actually perform a second strip search on her in December of 2014, so Davies is entitled to judgment as a matter of law on this claim.

Moreover, as noted above, even assuming for the sake of argument that plaintiff might have some basis for the court to set aside her judicial admission, her own declaration does not indicate that Davies actually performed a second, separate strip search, nor ordered one. At most, plaintiff appears to be characterizing defendant Davies and Janak's observing her getting dressed as she left the shower on December 15, 2014, to be a strip search. However, the officers came upon her in the shower acting strangely and, only when her strange behavior continued, did they direct her to get dressed and go back to her cell. Not only did the officers have good grounds to remain while she dressed given her peculiar behavior, but plaintiff has not adduced any evidence that the officers observing her did so in an unreasonable manner or with intent to harass or humiliate her. As such, defendants are entitled to judgment as a matter of law on this last claim as well.

ORDER

IT IS ORDERED that:

1)      Defendants' motion for summary judgment (dkt. #22) is GRANTED.

2)      The clerk of court is directed to enter judgment in defendants' favor and
close this case.

Entered this 14th day of January, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge